**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

In re:                                          Chapter 11

CARDINAL HOMES, INC., *et al.*                  Case No. 19-36275-KRH
                                                (Jointly Administered)

            Debtors.[1]

**ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE**
**DEBTORS' ASSETS TO KITUWAH, LLC FREE AND CLEAR OF LIENS, CLAIMS,**
**ENCUMBRANCES, AND OTHER INTERESTS; (B) AUTHORIZING AND**
**APPROVING THE DEBTORS' PERFORMANCE UNDER THE ASSET PURCHASE**
**AGREEMENT, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF**
**CERTAIN OF THE DEBTORS' EXECUTORY CONTRACTS AND UNEXPIRED**
**LEASES RELATED THERETO; AND (D) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of Cardinal Homes, Inc. and Alouette Holdings, Inc.,

the above-captioned debtors and debtors-in-possession (the "Debtors"), for, among other things,

the entry of orders, pursuant to Sections 105(a), 363 and 365 of title 11 of the United States

Code, 11 U.S.C. §101, *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 6004 and 6006

of the Federal Rules of Bankruptcy Procedures (each a "Bankruptcy Rule" and, collectively, the

"Bankruptcy Rules"): (I) (a) approving and authorizing bidding procedures in connection with

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of their taxpayer identification numbers are as follows: Cardinal Homes, Inc. (9112) and Alouette Holdings, Inc. (9139).  The headquarters of Cardinal Homes, Inc. are located at 525 Barnesville Highway, Wylliesburg, VA 23976 and the headquarters of Alouette Holdings, Inc. are located at 307 Palomino Road, Buffalo Junction, VA 24529-2424.
[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Motion and Bidding Procedures Order.

Michael E. Hastings (Virginia Bar No. 36090)
Brandy M. Rapp (Virginia Bar No. 71385)
WHITEFORD, TAYLOR & PRESTON LLP
Two James Center
1021 E. Cary St., Suite 1700
Richmond, Virginia 23219
T: (804) 799-7859
F: (804) 977-3295
mhastings@wtplaw.com
brapp@wtplaw.com

*Counsel for the Debtors and*
 *Debtors in Possession*

the sale of substantially all of the Debtors' assets (the "Sale Assets")(the "Bidding Procedures"), (B) approving and authorizing the Break-Up Fee, (C) approving and authorizing the IB Compensation, (D) scheduling the related Auction and hearing to consider approval of the Sale (defined herein), (E) approving procedures related to the assumption and assignment of certain executory contracts and unexpired leases; (F) approving the form and manner thereof; and (G) granting related relief (collectively, the "Bidding Procedures Relief") and (II)(A) authorizing the sale of the Sale Assets free and clear of liens, claims, encumbrances, and other interests, (B) authorizing and approving the Debtors' performance under the Stalking Horse APA, (C) approving the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto, and (D) granting related relief; the Court having entered an order granting the Bidding Procedures Relief, approving the Bidding Procedures and granting certain related relief on January 15, 2020 [Docket No. 133] (the "Bidding Procedures Order"); and Kituwah, LLC[3] (the "Stalking Horse") having been deemed the Successful Bidder on the Sale Assets by the Debtors pursuant to the Bidding Procedures Order; and the Court having conducted a hearing on the relief requested in the Motion concerning the sale of the Sale Assets on February 13, 2020 (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, declarations and other evidence submitted in support thereof, and the Asset Purchase Agreement, dated January 2, 2020 by and between the Debtors and the Stalking Horse (as amended, supplemented or otherwise modified, together with all exhibits and annexes thereto, the "Stalking Horse APA"), a true copy of which is attached hereto as **Exhibit 1**; and the Court having heard statements of counsel and the evidence presented in support of the relief

---

[3] Any reference to Kituwah, LLC or the Stalking Horse shall include Kituwah, LLC or its assignees, if any, as required by the context.

requested in the Motion at the Sale Hearing; and no objections having been lodged against the Motion; and due notice of the Motion, the Stalking Horse APA and the Bidding Procedures Order having been given; and having determined that the relief requested in the Motion concerning the sale of the Sale Assets is in the best interests of the Debtors, their estates, creditors and all other parties in interest; and the Court having jurisdiction over this matter; and the legal and factual bases set forth in the Motion and at the Sale Hearing establishing just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

## I.      Jurisdiction, Final Order and Statutory Predicates

A.      The Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This order (the "Sale Order") constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.      The statutory predicates for the relief requested in the Motion are sections 105(a), 363(b), (f), and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9007 and 9014.

D.      The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

E.      To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such. Any findings of fact or conclusions of law stated by the Court on the record at the Sale Hearing are hereby incorporated herein, to the extent they are not inconsistent herewith.

F.      The Stalking Horse has acted and will be acting in good faith pursuant to section 363(m) of the Bankruptcy Code in closing the transaction (the "Closing") contemplated by the Stalking Horse APA (the "Sale").

II.      **Notice of the Sale, Auction and the Cure Amounts**

G.      Actual written notice of the Sale Hearing, the Motion, the Sale, the Auction and the assumption, assignment and sale of the executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Stalking Horse pursuant to the Stalking Horse APA (which are identified on **Exhibit 2** of this Sale Order; such executory contracts and such unexpired leases, the "Assumed Contracts") has been given, and such notice provided a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein to all known interested persons and entities, including, but not limited to the following parties (the "Notice Parties"):  (1) the Office of the United States Trustee for the Eastern District of Virginia; (2) the Office of the United States Attorney for the Eastern District of Virginia;  (3) proposed counsel to the Official Committee of Unsecured Creditors of Cardinal Homes, Inc. (the "Committee"); (4) Internal Revenue Service;  (5) counsel to the Stalking Horse; (6) counsel to

Newtek Small Business Finance, LLC ("Newtek"); (7) all entities known by the Debtors that may have a lien, claim, encumbrance, or other interest in the Sale Assets (for which identifying information and addresses are available to the Debtors); (8) the Debtors' twenty (20) largest unsecured creditors; (9) all non-Debtor parties to the executory contracts and unexpired leases; (10) all entities listed on the Creditor Matrix; (11) any governmental unit known to the Debtors to have a claim in this case; and (12) all parties that have requested notice in these cases under Bankruptcy Rule 2002.

H.      In accordance with the provisions of the Bidding Procedures Order, the Debtors served the Cure Notice (as defined in the Bidding Procedures Order) upon the Stalking Horse and the Contract Counterparties notifying them: (i) that the Debtors seek to assume and assign the Assumed Contracts on the Closing Date (expected to occur on or about February 19, 2020) to the Stalking Horse; and (ii) of the relevant cure amounts required to be paid in connection with the assumption and assignment of the Assumed Contracts. Pursuant to Bankruptcy Rule 6006(c), the Court finds that the service of such Cure Notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of establishing a cure amount for the Assumed Contracts to be assumed and assigned to the Stalking Horse. The Stalking Horse and the Contract Counterparties had a sufficient opportunity to object to the cure amounts set forth in the Cure Notice.

I.      The Debtors' Sale Notice (as defined in the Bidding Procedures Order) provided all interested parties with timely, sufficient and proper notice of the Sale, the Sale Hearing and the Auction.

J.      The Cure Notice provided the Stalking Horse and the Contract Counterparties with proper and sufficient notice of the potential assumption and assignment of the Assumed Contracts

and any cure amounts relating thereto, and the procedures set forth therein with regard to any such cure amounts satisfy the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

K.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Sale Hearing, and the Sale [Docket Nos. 113, 120, 145, 146, 149, and 163] was provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014. The Debtors also have complied with all obligations to provide notice of the Auction, the Sale Hearing, and the Sale required by the Bidding Procedures Order. The notices described in paragraphs G to K of this Section II were good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Auction, the Sale Hearing, the Sale, the assumption, assignment and sale of the Assumed Contracts is necessary or required.

L.      The disclosures made by the Debtors concerning the Motion, the Stalking Horse APA, the Auction, the Sale, and the Sale Hearing were accurate, complete and adequate under the circumstances.  As evidenced by the *Market Validated Price Report* dated February 8, 2020, and filed with the Court on February 12, 2020 [Docket No. 165] and received into evidence at the Sale Hearing, the Debtors, through SC&H Capital, the Debtors' investment bankers ("SC&H"), among other actions:

(1)      identified the most likely prospects to consider investing in or buying the Debtors' assets, based on their Standard Industrial Classification ("SIC") code, size, or because of a known interest in this type of investment, SC&H initially identified approximately 1,330 companies to mail to, 1,021 companies to email, and 67 companies to call;

(2)      completed 67 outreach calls within the first week of SC&H retention;

(3)      produced a Confidential Information Memorandum (CIM) for the Debtors

comprised of all of the basic company facts, figures, and pictures used as a

central information piece in the Virtual Data Room ("VDR") to provide an

overview of the Sale Assets;

(4)      assembled the information provided by the Debtors into a VDR accessible

to all prospects that expressed interest in the Sale Assets and executed a

confidentiality agreement, and SC&H also created a book with the same

information for those that preferred a hard copy;

(5)      caused print advertisements to be published in the national edition of ***The

Wall Street Journal*** on January 22, 23, and 24;

(6)      published an advertisement for the Sale Assets on *Modular Home Builder*,

a blog dedicated to the modular housing industry, and caused an

advertisement to run in the January 24, 27, and 29 editions, and SC&H

published an ad in *Building Design and Construction's* eNewsletter which

ran on January 23;

(7)      caused the sale of the Debtors' assets to be listed on the largest Internet

listing service, ***Bizbuysell.com***, and because SC&H is a member of

***BrokerWorks.com***, the listing also was included on over 135 partner

websites   across   the   US,   including   ***Bizquest.com,   Bloomberg

Businessweek***, ***Bizjournals***, and ***The Wall Street Journal Small

Business***, and the business and property were listed with several internet

listing services for commercial real estate that SC&H maintains memberships in, including **Costar**, **LoopNet** and **PropertyLine**;

(8)    drafted an Auction Notice announcing the auction, the associated dates, and how prospects might participate in the Auction, distributed such notices to all the prospects that had signed confidentiality agreements and still were considered active prospects on the distribution dates, and such auction notice emails were distributed to all active prospects on January 24, January 31, and February 5, and included attachments of the Form APA and the Bidding Procedures;

(9)    received 40 executed confidentiality agreements from prospective bidders who were provided access to the VDR concerning the Debtors, roughly half of which would be considered strategic buyers operating in the construction industry and the other half consisting of financial buyers, many of which are private equity investors already having investments in the construction and/or modular construction industries; and

(10)    visited the Debtors' facility with interested prospective bidders, Van Metre Homes and Cavco/Fleetwood Homes.

## III. Good Faith of the Stalking Horse

M.    The Stalking Horse is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

N.    The Stalking Horse is purchasing the Sale Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and therefore is entitled to the full protection of that provision.   The Stalking Horse has proceeded in good faith in all

respects in connection with this proceeding in that, *inter alia*: (a) the Stalking Horse recognized that the Debtors were free to deal with any other party interested in acquiring the Sale Assets following and pursuant to the terms of the Bidding Procedures Order, the Bidding Procedures and the Stalking Horse APA; (b) the Stalking Horse complied with all provisions in the Bidding Procedures Order; (c) the Stalking Horse agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (d) all payments to be made by the Stalking Horse and other agreements or arrangements entered into by the Stalking Horse in connection with the Sale have been disclosed; (e) the Stalking Horse has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (f) no common identity of directors or controlling stockholders exists between the Stalking Horse and the Debtors; (g) the Stalking Horse in no way caused the Debtors' financial condition which resulted in the commencement of these Chapter 11 Cases; and (h) the negotiation and execution by the Stalking Horse of the Stalking Horse APA and any other agreements or instruments related thereto was at arms' length and in good faith.

## IV.   Highest and Best Offer

O.     The Debtors conducted the bid and auction process in accordance with the provisions of the Bidding Procedures Order and the Debtors have otherwise complied with the Bidding Procedures Order in all material respects. The bid and auction process conducted pursuant to the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Sale Assets. Such process was duly noticed and conducted in a non-collusive, fair and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Sale Assets.

P.      The consideration provided by Stalking Horse under the Stalking Horse APA, including the assumption of the Assumed Liabilities, constitutes the highest or best offer for the Sale Assets, and will provide a higher and better recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the Stalking Horse APA constitutes and is the product of the highest and best offer for the Sale Assets is a valid and sound exercise of the Debtors' and their officers' and directors' business judgment consistent with their respective fiduciary duties.

Q.      The Stalking Horse APA represents a fair and reasonable offer to purchase the Sale Assets under the circumstances of these Chapter 11 Cases. No other person, entity or group of entities offered to purchase the Sale Assets for greater economic value to the Debtors' estates than the Stalking Horse.

R.      Approval of the Stalking Horse APA and the Motion concerning the sale of the Sale Assets, and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their creditors, their estates and other parties in interest.

S.      The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

**V.      No Fraudulent Transfer; No Successor Liability**

T.      The Stalking Horse APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act). The consideration provided by the Stalking Horse pursuant to the Stalking Horse APA is fair and

10

adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).

U.      By virtue of the consummation of the Sale of the Sale Assets, (1) the Stalking Horse is not a continuation of the Debtors or their respective estates, there is no continuity between the Stalking Horse and the Debtors, there is no common identity between the Debtors and the Stalking Horse, there is no continuity of enterprise between the Debtors and the Stalking Horse, and the Stalking Horse is not a mere continuation of the Debtors or their estates, (2) the Stalking Horse is not holding itself out to the public as a continuation of the Debtors or their estates, and (3) the Sale of the Sale Assets does not amount to a consolidation, merger or de facto consolidation or merger of the Stalking Horse and the Debtors and/or the Debtors' estates. Accordingly, the Stalking Horse is not and shall not be deemed a successor to the Debtors, for any purpose or under any theory, as a result of the consummation of the Sale contemplated by the Stalking Horse APA.

V.      Notwithstanding the foregoing, no employee of the Debtors as of the Closing who becomes an employee of the Stalking Horse immediately following the Closing may be considered to have experienced an employment loss for purposes of any statute or contract requiring prior notice and/or payment of severance benefits in the event of employment loss.

**VI.    Validity of Transfer**

W.      The Debtors and the Stalking Horse each have full corporate power and authority to execute and deliver the Stalking Horse APA and all other documents contemplated thereby, and no further consents or approvals are required for the Debtors or the Stalking Horse to

11

consummate the transactions contemplated by the Stalking Horse APA, except as otherwise set forth in the Stalking Horse APA.

X.    The Sale Assets constitute property of the Debtors' estates and title thereto is presently vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

Y.    The transfer of each of the Sale Assets to the Stalking Horse will be as of the Closing Date a legal, valid, and effective transfer of such assets, and vests or will vest the Stalking Horse with all right, title, and interest of the Debtors and their respective estates to the Sale Assets free and clear of (a) all liens, including without limitation, all "liens" within the meaning of section 101(37) of the Bankruptcy Code (collectively, "Liens"), (b) all claims, including, without limitation, all "claims" within the meaning of sections 101(5) and 102(2) of the Bankruptcy Code and all interests, encumbrances, rights of setoff, recoupment, netting and deductions (collectively, "Claims") and (c) all liabilities, whether imposed by agreement, understanding, law, equity or otherwise and whether known or unknown, fixed or contingent or arising prior to or subsequent to the commencement of these Chapter 11 Cases (each of the foregoing described in clauses (a), (b) and (c) in this paragraph collectively or individually, the "Adverse Interests").

## VII.    Section 363(f) Is Satisfied

Z.    The Stalking Horse would not have entered into the Stalking Horse APA and would not consummate the transactions contemplated thereby (by paying the purchase price, including all of the other consideration contemplated by the Stalking Horse APA and assuming the Assumed Liabilities) if the sale of the Sale Assets, exclusive of the Assumed Contracts, to the Stalking Horse were not free and clear of all Adverse Interests of any kind or nature whatsoever

and if the assumption, assignment and sale of the Assumed Contracts to the Stalking Horse, were not, except as otherwise provided in the Stalking Horse APA with respect to the Assumed Liabilities arising from or related to the Assumed Liabilities, free and clear of all Adverse Interests of any kind or nature whatsoever, or if the Stalking Horse would, or in the future could be liable for any of such Adverse Interests, including, but not limited to, Adverse Interests in respect of the following: (1) all mortgages, deeds of trust and security interests; (2) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtors; (3) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (l) any other state or federal benefits or claims relating to any employment with the Debtor or any of its predecessors; (4) any bulk sales or similar law; (5) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (6) any environmental law(s); and (7) any theories of successor or transferee liability.

AA.    The Debtors may sell the Sale Assets free and clear of all Adverse Interests against the Debtors, their estates or any of the Sale Assets, exclusive only of the Assumed

Contracts, which shall remain subject to the Assumed Liabilities related to each such Assumed

Contract because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of

the Bankruptcy Code has been satisfied. Those holders of Adverse Interests against or in the

Debtors, their estates or any of the Sale Assets who did not object, or who withdrew their

objections, to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2)

of the Bankruptcy Code. Those holders of such Adverse Interests, exclusive of the interests

arising from or related to the Assumed Liabilities, who did object fall within one or more of the

other subsections of section 363(f) and are adequately protected by having their Adverse

Interests, if any, in each instance against the Debtors, their estates or any of the Sale Assets,

attach to the net  proceeds of the Sale ultimately attributable to the Sale Assets in which such

creditor or interest holder alleges an interest, in the same order of priority, with the same validity,

force and effect that such creditor or interest holder had prior to the Sale, subject to any claims

and defenses the Debtors and their estates may possess with respect thereto.

### VIII.   Assumption and Assignment of the Assumed Contracts

BB.    The assumption and assignment of the Assumed Contracts pursuant to the terms

of this Sale Order are integral to the Stalking Horse APA and are in the best interests of the

Debtors and their estates, creditors, interest holders and other parties in interest, and represents

the reasonable exercise of sound and prudent business judgment by the Debtors.  The amounts

set forth on **Exhibit 2** annexed hereto are the sole amounts necessary under sections 365(b)(1)

(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all

actual pecuniary losses under the Assumed Contracts (collectively, the "Cure Amounts").

CC.    Pursuant to the terms of the Stalking Horse APA, the Stalking Horse has:

(1) cured and/or provided adequate assurance of cure of any defaults existing prior to the Closing

Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; (2) provided compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code; and (3) provided adequate assurance of its future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

DD.    No default exists in the Debtors' performance under the Assumed Contracts as of the Closing Date other than the failure to pay Cure Amounts or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.

## IX.    Compelling Circumstances for an Immediate Sale

EE.    To maximize the value of the Debtors' assets, it is essential that the Sale of the Sale Assets occur within the time constraints set forth in the Stalking Horse APA. The consummation of the Sale is necessary both to preserve and maximize the value of the Debtors' assets for the benefit of the Debtors, their estates, their creditors, interest holders and all other parties in interest in these Chapter 11 Cases, and maximize creditor recoveries.

FF.    The consummation of the transaction contemplated by the Stalking Horse APA is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the transaction.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED**

**THAT:**

**General Provisions**

1.      The relief requested in the Motion related to the sale of the Sale Assets is granted and approved in its entirety, and the Sale contemplated thereby and by the Stalking Horse APA is approved as set forth in this Sale Order.

2.      This Court's findings of fact and conclusions of law, set forth in the Bidding Procedures Order, are incorporated herein by reference.

3.      No objections were lodged against the Motion on or before the deadline to file such objections pursuant to the Bidding Procedures Order.  All objections to the relief requested in the Motion related to the sale of the Sale Assets that were raised at or before the Sale Hearing and have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits or the interests of such objections have been otherwise adequately provided for or satisfied.

**Approval of the Stalking Horse APA**

4.      The Stalking Horse APA and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved as set forth herein.

5.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale of the Sale Assets to the Stalking Horse pursuant to and in accordance with the terms and conditions of the Stalking Horse APA, (b) close the Sale as contemplated in the Stalking Horse APA and this Sale Order, and (c) execute and deliver, perform under, consummate, implement

and close fully the Stalking Horse APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse APA and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Stalking Horse APA and such other ancillary documents.

6.      At Closing, the Stalking Horse shall pay to the Debtors the sum of Five Million Eight Hundred Thousand Dollars ($5,800,000.00) (the "Purchase Price"). The Purchase Price shall be paid to the Debtors as follows: (i) an amount in cash equal to Five Million Five Hundred Thousand Dollars ($5,500,000.00), less any interest accrued on the Kituwah Notes (as defined below) prior to the date that Cardinal filed its voluntary petition and (ii) an assumption of the prepetition loans from the Stalking Horse to the Debtors consisting of a Promissory Note dated October 11, 2019 in the original principal amount of $250,000.00 and a Promissory Note dated November 14, 2019 in the original principal amount of $50,000.00 (collectively, the "Kituwah Notes") plus interest on the Kituwah Notes to the date that Cardinal filed its voluntary petition . The Purchase Price shall be  transferred by wire to Cardinal Homes, Inc.'s Debtor In Possession Account, Wells Fargo Account Number XXXXXX3826 (the "DIP Account"), and the Kituwah Notes shall be marked  satisfied.  Nothing herein contained shall be construed to constitute an allocation of the Purchase Price between the Debtors, including, without limitation, the deposit of the proceeds from the Sale into the DIP Account of Cardinal Homes, Inc., and all parties in interest shall retain all rights with respect to the allocation of the Purchase Price among the Sale Assets.

7.      In addition, at Closing, the Stalking Horse shall pay:  (a) its pro-rated share of the costs and expenses provided for in Section 3.2 of the Stalking Horse APA; and (b) the Cure

Amounts to the holders of the Assumed Contracts.  The Debtors are authorized to pay at Closing: (a) all sales, use, excise, transfer, ad valorem, value added, and similar taxes imposed by any governmental authority in any jurisdiction that are incurred in connection with the Sale, except insofar as the Debtors and the Stalking Horse are relieved of any responsibility for such taxes under the provisions of this Order and any applicable provisions of the Bankruptcy Code; (b) any ad valorem taxes due from the Debtors for any prior years; (c) as provided for in Section 3.2 of the Stalking Horse APA, their post-petition pro-rated share of the costs and expenses for ad valorem and other taxes, utility charges and deposits, rents, prepaid expenses, security services and any and all other expenses relating to the Sale Assets, the Assumed Contracts or the Assumed Obligations, and any of the foregoing pre-petition unsecured obligations shall be treated in accordance with the applicable provisions of the Bankruptcy Code; (d) payment of SC&H's fees and expenses in accordance with the *Order Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code Authorizing the Retention and Employment of SC&H Capital, A Division of SC&H Group, Inc., as Investment Banker for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Dates* entered on January 29, 2020 (Docket No. 153) and (e) the repayment of the DIP Loan, except as provided in decretal paragraph 9 herein.

8. The Debtors shall provide a preliminary Settlement Statement to the Committee and Newtek as soon as feasible prior to Closing.  Within ninety (90) days after the Closing, the Stalking Horse shall distribute to the Debtors, the Committee and Newtek the final Settlement Statement setting forth all receipts and disbursements related to the Sale.  The Debtors, the Committee and Newtek shall have thirty (30) days from the date of receipt of the final Settlement Statement to file any objection with the Court to any receipts and/or disbursements related to the Sale.  Absent the timely filing of an objection, the Debtors and the Stalking Horse are authorized

18

to pay the net amount due under the final Settlement Statement without further Order of the Court.

9.      In the event that the Carve-Out for the Professionals is not fully funded by the Debtors prior to the Closing, as projected in the Budget, the Debtors shall pay an amount equal to the unfunded portion of the Carve-Out for the Professionals (the "Carve-Out Deficiency") from the proceeds of the Sale at Closing into the trust account maintained for the benefit of the Professionals at Mechanics Bank.  In the event that a Carve-Out Deficiency exists as of the Closing, the amount the Debtors pay to the DIP Lender in repayment of the DIP Loan will be reduced by an amount equal to the Carve-Out Deficiency, and the DIP Lender shall retain the security granted to it in the *Final Order Authorizing the Debtor Cardinal Homes, Inc. to Obtain Post-Petition, Secured Financing* entered on January 3, 2020 (Docket No. 108) and the *Final Order Authorizing the Debtor Alouette Holdings, Inc. to Obtain Post-Petition, Secured Financing* entered on December 12, 2019 in Case No. 19-36126 (Docket No. 39), including: (i) a lien on the assets of Cardinal pursuant to § 364(c)(2) and (c)(3) of the Bankruptcy Code; and (ii) a super-priority administrative expense claim pursuant to § 364(c)(1) against the Debtors' estates until such time as all amounts owing to the DIP Lender are satisfied according to the terms of the DIP Loan Agreement, including without limitation the payment of interest as provided in the Debtor-In-Possession Loan and Security Agreement, but exclusive of attorneys' fees which the DIP Lender has agreed to waive.   All net proceeds of the Sale, after the payments authorized by the decretal paragraphs 7 and 8 shall be deposited into the DIP Account and remain  in such account pending further order of this Court concerning the allocation and distribution of such net proceeds.

10.     This Sale Order shall be binding in all respects upon the Debtors, including the Debtors' estates, all holders of any Claim(s) (whether known or unknown) or Adverse Interests against the Debtors, any holders of Adverse Interests against or on all or any portion of the Sale Assets, all Contract Counterparties, the Stalking Horse and all successors and assigns of the Stalking Horse, the Sale Assets and any trustees, if any, subsequently appointed in these Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of these Chapter 11 Cases. This Sale Order and the Stalking Horse APA shall inure to the benefit of the Debtors, their estates, their creditors, the Stalking Horse and their respective successors and assigns.

11.     Any amounts payable by the Debtors under the Stalking Horse APA or any of the documents delivered by the Debtors in connection with the Stalking Horse APA, including without limitation, any allowed claims for breach thereof  shall be paid in the manner provided in the Stalking Horse APA without further order of the Bankruptcy Court, shall be an allowed administrative claim in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code with priority over any and all administrative expense claims, and such claims shall not be discharged, modified or otherwise affected by any reorganization plan for the Debtors, except by written agreement with the Stalking Horse or its successors or assigns (such agreement to be provided in the Stalking Horse's or its successors' or assigns' respective sole discretion).

**Transfer of the Sale Assets**

12.     Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Sale Assets to the Stalking Horse on the Closing Date. The Sale Assets shall be transferred to the Stalking Horse upon and as of the Closing Date

20

and such transfer shall constitute a legal, valid, binding and effective transfer of the Sale Assets and shall be free and clear of all Adverse Interests, except Assumed Liabilities expressly assumed under the Stalking Horse APA. Upon the Closing, the Stalking Horse shall be entitled to take title to and possession of the Sale Assets. Pursuant to section 363(f) of the Bankruptcy Code, except with regard to the Assumed Contracts, which shall remain subject to the Assumed Liabilities related to each such Assumed Contract expressly, the transfer of title to the Sale Assets and the Assumed Contracts shall  be free and clear of all Adverse Interests; including, without limitation, any and all claims relating to the Debtors' employee benefit plans, and other employee related liabilities of the Debtors, based on any theory, including without limitations any successor or successor-in-interest liability theory. Adverse Interests shall attach solely to the net  proceeds of the Sale with the same validity, priority, force and effect that they now have as against the Sale Assets, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.  Without limiting the generality of the foregoing, all liens, claims, rights, defenses and other interests that any secured lender may have, if any, with respect to any of the assets being sold, including, without limitation, the Sale Assets, shall attach to the net proceeds received from the sale to the same extent, validity and priority as they are maintained with respect to the assets being sold.  Any and all rights, remedies, defenses, claims, entitlements and interests of the Debtors, the Committee, the Stalking Horse and Newtek, if any, including, without limitation, any and all rights, remedies, defenses, claims, entitlements and interests arising under § 55.1-609 of the Virginia Code and that certain Order entered January 8, 2020 [Docket No. 118], shall be, and hereby are, preserved, maintained and unaffected by any sale and all such  rights, remedies, defenses, claims, entitlements and interests of Newtek, the Stalking Horse, the Debtors and the Committee, if any, shall attach to the sale proceeds and shall be

asserted, enforced and maintained in the same manner and to the same extent as if a sale did not occur.

13.     Except as expressly provided by the Stalking Horse APA with respect to Assumed Liabilities expressly assumed therein, all persons and entities holding Adverse Interests in all or any portion of the Sale Assets arising under or out of, in connection with, or in any way relating to the Debtors, the Sale Assets, the operation of the Debtors' businesses prior to the Closing Date or the transfer of the Sale Assets to the Stalking Horse, hereby are forever barred, estopped and permanently enjoined from asserting against the Stalking Horse or its successors or assigns, their property or the Sale Assets, such persons' or entities' Adverse Interests in and to the Sale Assets. On the Closing Date, each creditor (and, the Stalking Horse, on behalf of each creditor) is authorized to execute such documents and take all other actions as may be deemed by the Stalking Horse to be necessary or desirable to release Adverse Interests, Liens or Claims on the Sale Assets, if any, as provided for herein, as such Adverse Interests, Liens or Claims may have been recorded or may otherwise exist.

14.     All persons and entities that are in possession of some or all of the Sale Assets on the Closing Date are directed to surrender possession of such Sale Assets to the Stalking Horse or its assignee as of the Closing Date.

15.     A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to cancel any Adverse Interests and encumbrances of record.

16.     If any person or entity which has filed statements or other documents or agreements evidencing Adverse Interests in all or any portion of the Sale Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and

easements, and any other documents necessary or desirable to the Stalking Horse for the purpose of documenting the release of all Adverse Interests (other than any Adverse Interests arising from or related to the Assumed Liabilities related to each such Assumed Contract expressly assumed under the Stalking Horse APA), which the person or entity has or may assert with respect to all or any portion of the Sale Assets, the Stalking Horse and the Debtors are each hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Sale Assets.

17. This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse APA.

**Assumed Contracts**

18. Upon the Closing of the Sale, the Debtors are authorized and directed to assume and assign the Assumed Contracts to the Stalking Horse free and clear of all Adverse Interests, as described herein. The payment of the applicable Cure Amounts by the Stalking Horse, as required by the Stalking Horse APA, shall (a) effect and constitute a full and complete cure of all defaults existing thereunder as of the Closing Date, (b) constitute the full compensation for any

actual pecuniary loss to such Contract Counterparties resulting from such default, and (c) together with the assignment by the Debtors to and the assumption of the Assumed Contracts by the Stalking Horse, constitute adequate assurance of future performance thereof. The Debtors shall then have assumed the Assumed Contracts and shall have assigned the Assumed Contracts to the Stalking Horse. Pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of the Assumed Contracts shall not be a default under the terms of any of the Assumed Contracts, notwithstanding any term or condition contained therein to the contrary. After the payment of the relevant Cure Amounts by the Stalking Horse, as required by the Stalking Horse APA, neither the Debtors nor the Stalking Horse shall have any further liabilities or obligations to the Contract Counterparties other than the Stalking Horse's obligations under the Assumed Contracts that accrue and become due and payable on or after the Closing Date.

19.    Any provisions in any Assumed Contract that prohibits or conditions the assignment of such Assumed Contract or allows the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract, shall constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Stalking Horse of the Assumed Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Stalking Horse shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts.

20.    Upon the Closing and the payment of the relevant Cure Amounts, if any, the Stalking Horse shall be deemed to be substituted for the Debtors as a party to the applicable

Assumed Contracts and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Contracts.

21.     Upon the payment of the applicable Cure Amounts, if any, the Assumed Contracts will remain in full force and effect, and no default shall exist under the Assumed Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

22.     There shall be no rent accelerations, assignment fees, increases (including advertising rates) or any other fees charged to the Stalking Horse or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

23.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all Contract Counterparties are forever barred and permanently enjoined from raising or asserting against the Stalking Horse any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of the Closing Date or arising by reason of the Closing.

**Other Provisions**

24.     Effective upon the Closing Date and except as otherwise provided by stipulations filed with or announced to the Court with respect to a specific matter or as set forth in the Stalking Horse APA with respect to Assumed Liabilities expressly assumed in the Stalking Horse APA, all persons and entities are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Stalking Horse, its successors and assigns, or any of the Sale Assets, with respect to any (a) Adverse Interests arising under, out of, in connection with or in any way relating to the Debtors, the Stalking

Horse, any of the Sale Assets, or the operation of any of the Sale Assets prior to the Closing of the Sale, or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Stalking Horse, its successors or assigns, assets or properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Stalking Horse, its successors or assigns, assets or properties; (iii) creating, perfecting or enforcing any Adverse Interests against the Stalking Horse, its successors or assigns, assets or properties; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Stalking Horse or its successors or assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Sale Assets or conduct any of the businesses operated with any of the Assets.

25.     Except for the Assumed Liabilities as set forth in the Stalking Horse APA or as otherwise expressly set forth in the Stalking Horse APA, the Stalking Horse shall not have any liability or other obligation of the Debtors arising under or related to any of the Sale Assets or the Stalking Horse APA or the transactions related thereto. Without limiting the generality of the foregoing, and except for the Assumed Liabilities as provided in the Stalking Horse APA, the Stalking Horse shall not be liable for any Claims or any other Adverse Interests against the Debtors or any of its predecessors or affiliates, and the Stalking Horse shall not have any successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger or

substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Sale Assets prior to the Closing. The Stalking Horse has given substantial consideration under the Stalking Horse APA for the benefit of the holders of any Adverse Interests. The consideration given by the Stalking Horse shall constitute valid and valuable consideration for the releases of any potential claims of successor liability, which releases shall be deemed to have been given in favor of the Stalking Horse by all holders of Adverse Interests against or interests in the Debtors or any of the Sale Assets.

26.      The transactions contemplated by the Stalking Horse APA are undertaken by the Stalking Horse without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assumed Contracts), unless such authorization and such Sale are duly stayed pending such appeal. The Stalking Horse is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

27.      Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these Chapter 11 Cases, (b) any subsequent chapter 7 cases into which these Chapter 11 Cases may be converted, or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Stalking Horse APA or the terms of this Sale Order.

28.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

29.     The failure specifically to include any particular provision of the Stalking Horse APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse APA be authorized and approved in its entirety.

30.     The Stalking Horse APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court.

31.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order, the Stalking Horse APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

32.     Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, 9014 or otherwise, the terms and conditions of this Sale Order shall be immediately effective and enforceable and shall not be stayed by any applicable statute or rule.

33.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

34.     To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in this Chapter 11 Case, the terms of this Sale Order shall govern.

Dated: <u>February 14, 2020</u>

/s/ Kevin R. Huennekens
UNITED STATES BANKRUPTCY JUDGE

Entered on Docket <u>02/14/2020</u>

28

WE ASK FOR THIS:

/s/ Michael E. Hastings
Michael E. Hastings (Virginia Bar No. 36090)
Brandy M. Rapp (Virginia Bar No. 71385)
WHITEFORD, TAYLOR & PRESTON LLP
Two James Center
1021 E. Cary St., Suite 1700
Richmond, Virginia 23219
T: (804) 799-7859
F: (804) 977-3295
mhastings@wtplaw.com
brapp@wtplaw.com
          *Counsel for the Debtors and Debtors in Possession*


SEEN AND AGREED:

/s/ Michael A. Condyles
Michael A. Condyles (Virginia Bar No. 23807)
KUTAK ROCK LLP
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
T: (804) 644-1700
michael.condyles@kutakrock.com
          *Counsel for Newtek Small Business Finance, LLC*


SEEN AND AGREED:

/s/ William E. Callahan, Jr.
William E. Callahan, Jr. (Virginia Bar No. 37432)
Gentry Locke
P.O. Box 40013
Roanoke, VA 24022-0013
T: (540) 983-9309
callahan@gentrylocke.com
          *Counsel for Stalking Horse*

SEEN AND AGREED:

/s/ Michael D. Mueller
Augustus C. Epps, Jr., Esquire
Michael D. Mueller, Esquire
Jennifer M. McLemore, Esquire
Bennett T. W. Eastham, Esquire
Williams Mullen
200 South 10th Street, Suite 1600
Richmond, VA  23219
aepps@williamsmullen.com
mmueller@williamsmullen.com
jmclemore@williamsmullen.com
beastham@williamsmullen.com
       *Proposed Counsel for the Official Committee of*
       *Unsecured Creditors of Cardinal Homes, Inc., et al.*


SEEN:

/s/ Kenneth N. Whitehurst, III
Kenneth N. Whitehurst, III (Virginia Bar No. 48919)
Shannon F. Pecoraro
Office of the United States Trustee
701 East Broad Street, Suite 4304
Richmond, VA 23219


<u>Local Rule 9022-1(C) Certification</u>

       The foregoing Order was endorsed by and/or served upon all necessary parties pursuant to Local Rule 9022-1(C).

                                */s/ Michael E. Hastings*
                                Michael E. Hastings

# Exhibit 1

Stalking Horse APA

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), is made as of this 2nd day of January, 2020, by and between Kituwah, LLC, a limited liability company the sole member of which is the Eastern Band of the Cherokee Indians ("Kituwah"), on the one hand, and Alouette Holdings, Inc., a Virginia corporation ("Alouette"), Cardinal Homes, Inc., a Virginia corporation ("Cardinal", and, together with Alouette, each a "Seller" and collectively the "Sellers"), on the other.

## W̲ I̲ T̲ N̲ E̲ S̲ S̲ E̲ T̲ H̲

WHEREAS, the Sellers have been engaged in, among other things, the manufacture and delivery of prefabricated housing (the "Business").

WHEREAS, on November 20, 2019, Alouette commenced a voluntary chapter 11 Bankruptcy Case (the "Alouette Case") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"), administered under Bankruptcy Case Number 19-36126.

WHEREAS, on December 2, 2019, Cardinal commenced a voluntary chapter 11 Bankruptcy Case (the "Cardinal Case", and, together with the Alouette Case, the "Bankruptcy Cases") in the Bankruptcy Court administered under Bankruptcy Case Number 19-36275.

WHEREAS, Kituwah and/or its assigns (each a "Purchaser" and collectively, the "Purchasers") desire to purchase from Sellers, and Sellers desire to sell to Purchasers, all of Sellers' interest in any real property and in any personal property, except as explicitly excluded herein.

WHEREAS, Purchasers desire to assume certain of Sellers' liabilities upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged by each party and intending to be legally bound hereby, subject to Bankruptcy Court approval, the Parties agree as follows:

## 1.    ARTICLE 1.

As used herein, the following terms shall have the following meanings:

*"Assumed Contracts"* shall have the meaning set forth in Section 2.3.

*"Auction"* means an auction of the Sale Assets conducted in accordance with the Sale Procedures Order.

*"Bankruptcy Cases"* shall have the meaning set forth in the Preamble.

*"Bankruptcy Petition"* means the voluntary bankruptcy petitions filed by the Sellers with the Bankruptcy Court in the Bankruptcy Cases.

"*Business Day*" means any day that is not a Saturday, Sunday, or other day on which banks are required or authorized by law to be closed in New York, New York.

"*Closing Date*" has the meaning set forth in Section 4.1.

"*Excluded Assets*" means:

(a) Sellers' minute books and other corporate books and records relating to their organization and existence;

(b) Sellers' rights under this Agreement, and all cash and non-cash consideration payable or deliverable to Sellers pursuant to the terms and provisions hereof;

(c) any contracts other than the Assumed Contracts and contracts covered by paragraph 2.3.1 below;

(d) all avoidance actions of Sellers' estates arising under Title 11 of the United States Code, including without limitation, sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code;

(e) all claims and causes of action of Sellers against Persons other than Purchasers (regardless of whether or not such claims and causes of action have been asserted by Sellers), and all rights of indemnity, warranty rights (other than warranty rights in connection with the Sale Assets), rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, of Sellers (regardless of whether such rights are currently exercisable);

(f) all rights under director and officer (or similar) insurance policies maintained by Sellers;

(g) any documents or other materials which are subject to attorney-client or other privilege; and

(h) all intercompany accounts receivable of Sellers as of the Closing Date.

"*Final Order*" means an order of the Bankruptcy Court or other court of competent jurisdiction:  (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion or alter or amend judgment, motion for rehearing, motion for new trial, or any other proceeding challenging the findings, conclusions or relief granted by the Bankruptcy Court has been timely filed or otherwise commenced or, if any of the foregoing has been timely filed or otherwise commenced, it has been disposed of by the Bankruptcy Court or other court of competent jurisdiction in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting and/or filing an appeal, a notice of appeal, motion for rehearing, motion for new trial , or any other proceeding challenging the finds, conclusions, or relief granted by the Bankruptcy Court or other court of competent jurisdiction shall have expired; and (c) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) days of the entry of the order at issue.

4840-9378-7821.v7

*"Included Assets"* means any and all personal property, known or unknown, of the Sellers, exclusive only of the Excluded Assets and including but not limited to:

(a) all cash, cash equivalents, and investment accounts of Sellers on hand or on deposit as of the Closing Date;

(b) all vehicles owned by Sellers as of the Closing Date;

(c) any and all amounts prepaid or deposited with and held by manufacturers, suppliers, subcontractors or other vendors related to the Sale Assets as of the Closing Date;

(d) the Assumed Contracts and all deposits, advances, and prepayments with respect to the Assumed Contracts;

(e) all accounts receivable of Sellers, whether pre- or post-petition, relating to the Business arising prior to the Closing Date, but excluding intercompany accounts receivables;

(f) all inventory, work-in-progress, and plans, drawings and specifications for all work-in-progress and for work competed at any time prior to the Closing of this Agreement owned by Sellers in connection with the Business as of the Closing Date;

(g) all items of machinery, equipment, supplies, furniture, fixtures, and other tangible personal property owned by Sellers as of the Closing unless otherwise specifically identified as an Excluded Asset;

(h) all intellectual property of Sellers (including but not limited to trademarks, patents, copyrights, trade names, and domain names, whether registered or unregistered);

(i) all social media accounts and related rights;

(j) all mailing lists and emailing lists of customers;

(k) all rights of Sellers under or arising out of all insurance policies relating to the operation of the Business (including all claims arising thereunder), unless non-assignable as a matter of law;

(l) all vested rights and privileges of Sellers under or relating to any Contracts to which Sellers are or were a party that are not capable of being assumed and/or assigned under Section 365 of the Bankruptcy Code to the extent such rights or privileges relate to or affect any Sale Asset;

(m) all rights under confidentiality agreements, non-disclosure agreements and similar agreements related to or affecting any Sale Asset;

(n) all licenses and permits, to the extent permissible by relevant law;

(o) all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors, and any other Person to the extent relating to or affecting any Sale Asset;

(p) all sales and promotional materials, catalogues and advertising literature relating to any Sale Asset;

3

(q) all goodwill, trademarks, service marks, intellectual property, trade secrets, and other intangible assets associated with or relating to, the Sale Assets, including customer and supplier lists;

(r) all of Sellers' telephone, cell phone, and facsimile numbers, e-mail listings and addresses, web sites, post office boxes, and all listings in all telephone books, directories, and web sites relating to the Business; and

(s) all non-privileged books, records, files and papers of Sellers relating primarily to the Business or the Sale Assets, including, without limitation, equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence, financial and accounting records, tax records and other similar documents and records (all in the state in which such records and information currently exist); provided, that Sellers shall be entitled to retain copies of such books, records, files and papers.

*"Knowledge"* of an individual means the actual knowledge of such individual. With respect to a Person (other than an individual), "Knowledge" means the actual knowledge of any individual who is serving as a director or executive officer (or in any similar capacity) of such Person.

*"Lien"* means any lien, security interest, pledge, hypothecation, encumbrance or other interest or claim (including, but not limited to, any and all "claims," as defined in Section 101(5) of the Bankruptcy Code, and any and all rights and claims under any bulk transfer statutes and similar laws) in or with respect to any of the Sale Assets (including, but not limited to, any options or rights to purchase such Sale Assets and any mechanics' or tax liens), whether arising by agreement, by statute or otherwise and whether arising prior to, on or after the date of the filing of the respective Bankruptcy Petitions in the respective Bankruptcy Cases.

*"Person"* means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

*"Purchase Price"* has the meaning set forth in Section 3.1.

*"Purchasers Default Termination"* has the meaning set forth in Section 3.2.1.

*"Sale Assets"* has the meaning set forth in Section 2.2.

*"Sale Motion"* means the Motion to (A) Approve Sale of Substantially All Assets of the Sellers, (B) Establish Related Sale Procedures, Including Break-Up Fee (C) Transfer Any and All Claims, Liens, Encumbrances and Interests in Sale Assets to Proceeds Of Sale, (D) Approve Form and Manner of Notice of Sale, and (E) Schedule Hearings.

*"Sale Procedures"* means the sale procedures approved by the Sale Procedures Order.

*"Sale Procedures Order"* means the Order entered by Bankruptcy Court approving the form and manner of notice for the sale contemplated herein, approving sale procedures governing such sale including a break-up fee, setting deadlines for bids and objections, and scheduling an auction and final hearing to consider approval of such sale.

"*Sale Approval Order*" means the Order entered by the Bankruptcy Court approving the transactions contemplated hereby and the definitive documentation and waiving the fourteen (14) day automatic stay of Bankruptcy Rule 6004(h), which Sale Approval Order has not been stayed.

"*Transaction Documents*" means this Agreement, the Employment Agreement for Bret Anthony Berneche, a Domain Name Assignment Agreement prepared by Purchasers and reasonably acceptable to Sellers, and any other bills of sale, agreements, instruments or documents reasonably requested by Purchasers in connection with the transfer of the Sale Assets, in each case prepared by Purchasers and reasonably acceptable to Sellers and entered into pursuant to this Agreement.

2. **ARTICLE 2.**

2.1. **Sale and Purchase of Real Property.**   Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, Sellers shall sell, assign, convey, transfer and deliver to Purchasers, and Purchasers shall, by Purchasers' payment of the Purchase Price, purchase and acquire from Sellers, all known interests in real property in the Bankruptcy Cases, including those six (6) parcels of real property described in that certain deed from Cardinal to Alouette recorded in Book 0441, Page 0518 in the Clerk's Office of the Circuit Court of Charlotte County, Virginia and all unknown interests in  real property used in connection with the Sellers' business operations or incidental thereto (the "Real Property Assets").

2.2. **Sale and Purchase of Personal Property.**   Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, Sellers shall sell, assign, convey, transfer and deliver to Purchasers, and Purchasers shall, by Purchasers' payment of the Purchase Price, purchase and acquire from Sellers, all known interests in personal property, all unknown interests in personal property used in connection with the Sellers' business operations or incidental thereto  and all other assets (apart from Real Property Assets sold pursuant to Section 2.1 of this Agreement) in the Bankruptcy Cases (the "Personal Property Assets", and, together with the Real Property Assets, the "Sale Assets"), including but not limited to the Included Assets; provided, however, that the Sale Assets shall not include the Excluded Assets. The Sale Assets shall be conveyed to the Purchasers "as is, where is," and without representation or warranty except as otherwise provided in this Agreement and free and clear of all Liens to the fullest extent permitted under Section 363 of the Bankruptcy Code.

2.3. **Assumed Liabilities.**   Purchasers shall have the right, but no obligation, to assume any of the Sellers' obligations to perform work pursuant to, and to the extent of, any security deposits made by any customer of Sellers to the Sellers relating to the business of the Sellers. For the purposes of clarity, Purchasers shall not assume any obligation to refund such deposits upon the request of such customers, apply such deposits to offset obligations of such customers, apply such deposits to alternate work or projects upon the request of such customers or use such deposits for any purpose other than the performance of related work. To the extent that any Assumed Contract is subject to a cure pursuant to section 365 of the Bankruptcy Code, Purchasers shall be responsible for such cure and at Closing shall pay or provide for payment of any amounts related to such cure obligations. Sellers will assign to Purchasers, and Purchasers will assume on the Closing Date, the executory obligations and liabilities of Sellers arising out of or relating

to the terms of the Assumed Contracts.  For those contracts and leases on the list of executory contracts and unexpired leases provided to Purchasers by Sellers on December 31, 2019, Purchasers shall provide Sellers a list of the contracts and leases to be assumed by Purchasers on or before January 17, 2020; for any other contracts or leases subsequently provided by Sellers, Purchasers shall provide written notice to Sellers whether Purchasers shall assume such contract or lease within a reasonable time (collectively, the "<u>Assumed Contracts</u>").

    **2.3.1.** **<u>Customer Deposits.</u>** Purchaser will honor customer contracts with deposits for those customers who want to continue to do business with the Purchasers and are not asserting claims based on any pre-closing defaults. If the customer agrees to pay the balance of the purchase price under the original contract, then Purchasers will perform the contract to deliver the product order. If a customer wants a refund or wants to assert claims against the Debtors in the Bankruptcy Cases for late delivery or other adjustments to the purchase price for pre-closing defaults, then Purchasers will not perform the contract.

**2.4.** **<u>Excluded Liabilities.</u>** Except as specified herein, Purchasers shall not assume any liabilities or obligations of Sellers, including, but not limited to, general liabilities, tax liabilities, environmental and employment-related liabilities and obligations, and any obligation or liability arising out of any breach, violation or default of or by Sellers, whether known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise (collectively, "<u>Excluded Liabilities</u>"). Notwithstanding anything in this Agreement to the contrary, Purchasers shall not assume any obligation or liability of Sellers arising out of or relating to (a)any product liability claim, (b) any claim for breach by Sellers of warranty or contract including, without limitation, those of Sellers' customers and/or subscribers, (c) any claim predicated on strict liability or any similar legal theory, (d) the violation of any law, ordinance or regulation, (e) any liability of Sellers, including for expenses or taxes, if any, in connection with, resulting from or arising out of this Agreement or the transactions contemplated herein, (f) any liability of Sellers for any other taxes, interest or penalties including, without limitation, any such taxes, interest or penalties assessed, imposed, accruing from any acts or activities arising or occurring prior to the Closing Date (as defined herein in subparagraphs 4.1) or those taxes specified in subparagraph 2.5 herein below, (g) any claim of a creditor arising after Closing pursuant to Section 502(h) of the Bankruptcy Code, or (h) any post-petition obligations of Sellers, or claim for administrative expenses (including attorneys' fees or fees of other professionals in the Bankruptcy Case, trustee's fees or claims of any party arising after the filing date of Sellers' petitions), all of which shall remain after Closing the obligation of Sellers' estates.

**2.5.** **<u>Sales Taxes.</u>**  Sellers shall be responsible for the payment of all sales, use, excise, transfer, value added, and similar taxes imposed by any governmental authority in any jurisdiction in connection with the transactions contemplated herein, except insofar as both Sellers and Purchasers are relieved of any responsibility for such taxes under the provisions of the Sale Approval Order and applicable provisions of the Bankruptcy Code.

6

3.  **ARTICLE 3.**

    **3.1.** **Purchase Price.**  In consideration for the Sale Assets, and subject to the other terms and conditions of this Agreement, and the entry and effectiveness of the Sale Approval Order, Purchasers shall pay Five Million Eight Hundred Thousand Dollars ($5,800,000.00) (the "Purchase Price"), which amount may be increased if the Purchasers, in their sole discretion, so elects at any Auction held pursuant to the Sale Procedures. The Purchase Price shall be paid to the Sellers as follows: (i) an amount in cash equal to Five Million Five Hundred Thousand Dollars ($5,500,000.00), and (ii) an assumption of the prepetition loans from Kituwah to the Sellers in the amount of Three Hundred Thousand Dollars ($300,000.00). The Purchase Price, shall be paid on the Closing Date, with such payment to be made by wire transfer of immediately available U.S. funds to an account designated by Sellers.

    **3.2.** **Prorations.** Liability for ad valorem and other taxes, utility charges and deposits, rents, prepaid expenses, security services and any and all other expenses relating to the Sale Assets, the Assumed Contracts or the Assumed Obligations, which are not treated elsewhere herein, will be allocated and prorated between Purchasers and Sellers through the Closing Date to reflect the principle that Sellers shall be responsible for the portion of such expenses arising on or prior to the Closing Date, and Purchasers shall be responsible for the portion of such expenses arising after the Closing Date. To the extent that any of such items are paid by Sellers prior to the Closing or are payable by Purchasers or Sellers after the Closing Date, such items shall be apportioned as of the Closing Date such that Sellers shall be liable for (and shall reimburse Purchasers to the extent that Purchasers shall have paid) that portion of any such item relating or attributable to periods on or prior to the Closing Date and Purchasers shall be liable for (and shall reimburse Sellers to the extent Sellers shall have paid) that portion of any such item relating or attributable to periods after the Closing Date. Should any amounts to be prorated not have been finally determined on the Closing Date, a mutually satisfactory estimate of such amounts made on the basis of Sellers' records shall be used as a basis for settlement at Closing, and the amount finally determined will be prorated as of the Closing Date, and appropriate settlement made as soon as practicable after such final determination. If as a result of any such settlement in accordance with the preceding sentence, either party is owed an amount from the other party, then the appropriate party shall make reimbursement for such amounts. Sellers and Purchasers agree to furnish each other with such documents and other records as each party reasonably requests in order to confirm all adjustment and proration calculations made pursuant to this Paragraph.

4.  **ARTICLE 4.**

    **4.1** **Closing.**  The closing of the transaction contemplated hereby will take place (the "Closing" or "Closing Date") on a date designated by the Purchasers but in no event later than ten (10) days after the Sale Approval Order has become a Final Order.  The Closing will take place at a location to be mutually agreed upon by Purchasers and Sellers.  The transfer of the Sale Assets shall be effective for all purposes as of 12:01 a.m. eastern time on the day following the Closing Date. In no event shall the Closing occur after February 19, 2020.

4.2 **Cooperation; Bankruptcy Court Approvals**.  The parties shall cooperate fully with each other and with their respective legal counsel and accountants in connection with any steps required to be taken as part of their respective obligations under this Agreement (including, without limitation, the obtaining of the approval of the Bankruptcy Court for the transactions contemplated herein), and all parties shall use their best efforts to consummate the transactions contemplated herein and to fulfill their obligations hereunder. Without limiting the generality of the foregoing, within five (5) business days after the date hereof, Sellers shall file a motion with the Bankruptcy Court seeking entry of the Sale Procedures Order and the Sale Approval Order (each defined below). Sellers shall use their best efforts to obtain entry of the Sale Procedures Order and the Sale Approval Order. Purchasers and Sellers each agrees to use their commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper, or advisable to satisfy the conditions to the other parties' obligation to consummate and make effective the transactions contemplated by this Agreement.

5. **ARTICLE 5.**

5.1 **Deliveries by Sellers.**  At the Closing, Sellers shall deliver, or cause to be delivered, to Purchasers the following (each in form and substance reasonably satisfactory to Purchasers):

5.1.1 Each Transaction Document to which any Seller is a party, duly executed by such Seller;

5.1.2 A certified copy of the Sale Approval Order, in a form acceptable to Purchasers,  that has been entered by the Bankruptcy Court;

5.1.3 Such bills of sale, deeds, endorsements, assignments, UCC terminations and other filings and other good and sufficient instruments, in form reasonably satisfactory to Purchasers, as Purchasers may reasonably request to vest in Purchasers all the right, title and interest of Sellers in, to or under any or all of the Sale Assets free and clear of Liens;

5.1.4 Physical possession of all of the Sale Assets capable of passing by delivery with the intent that title in such Sale Assets shall pass by and upon delivery;

5.1.5 An affidavit from each Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the Treasury regulations issued pursuant to Section 1445 of the Internal Revenue Code, stating that such Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code;

5.1.6 All keys to any buildings or facilities that are included in the Sale Assets, combinations to any safes thereon and passwords for all computers thereon and any security devices therein; and

5.1.7 All of the books and records relating to the assets of the Business.

5.1.8 Such other instruments of documents as Purchasers may reasonably request to fully effect the transfer of the Sale Assets and to otherwise consummate the transactions contemplated by this Agreement.

**5.2 Deliveries by Purchasers.**  At the Closing, Purchasers shall deliver, or cause to be delivered, the following:

    **5.2.1**  The Purchase Price.

    **5.2.2**  Such other instruments or documents as Sellers may reasonably request to fully effect the transfer of the Sale Assets and to otherwise consummate the transactions contemplated by this Agreement.

# 6   ARTICLE 6.

**6.1 Representations And Warranties Of Purchasers.**  Each Purchasers hereby represents and warrants to Sellers that the statements contained in this Article are correct and complete as of the date hereof and as of the Closing Date:

    **6.1.1**  The Purchasers are duly organized, validly existing and in good standing under the laws of their jurisdiction of organization. The Purchasers have the requisite power and authority to own or lease and to operate and use the Purchasers' properties and to carry on such Purchasers' businesses as now conducted.

    **6.1.2**  The Purchasers have the requisite power and authority necessary to enter into and perform their obligations under this Agreement and the other Transaction Documents to which they are parties and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by the Purchasers and the consummation by the Purchasers of the transactions contemplated herein have been duly and validly authorized by all requisite corporate or similar actions in respect thereof.  This Agreement has been duly and validly executed and delivered by the Purchasers and each other Transaction Document to which the Purchasers are a party will be duly and validly executed and delivered by the Purchasers at the Closing.  This Agreement constitutes and, when executed, the other Transaction Documents to which the Purchasers are a party will constitute, the legal, valid and binding obligation of such Purchasers, enforceable against such Purchasers in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

    **6.1.3**  Except for (i) the entry of the Sale Approval Order and (ii) for notices, filings and consents required in connection with the Bankruptcy Cases, the Purchasers are not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which they are parties or the consummation or performance of any of the transactions contemplated hereby or thereby.

    **6.1.4**  When the consents and other actions described in <u>Section 6.1.3</u> have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions

9

provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of the Purchasers under (a) any contract or other instrument to which it is bound, (b) any provision of the organizational documents of the Purchasers, or (c) any law, order or governmental authorization applicable to the Purchasers, except for any such conflict, violation, breach or default, individually or in the agreement, would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby.

6.1.5    Each Purchaser has and will have at the Closing sufficient cash in immediately available funds to pay its portion of the Purchase Price and any other costs, fees and expenses required to be paid by it under this Agreement and the other Transaction Documents.  As of the Closing and immediately after consummating the transactions contemplated by this Agreement and the other transactions contemplated by the Transaction Documents, the Purchasers will not (a) be insolvent (either because such Purchasers' financial condition are such that the sum of such Purchasers' debts are greater than the fair value of such Purchasers' assets or because the present fair value of such Purchasers' assets will be less than the amount required to pay such Purchasers' probable liability on such Purchasers' debts as they become absolute and matured), (b) have unreasonably small capital with which to engage in such Purchasers' business or (c) have incurred or plan to incur debts beyond such Purchasers' ability to repay such debts as they become absolute and matured.

6.1.6    There are no proceedings pending or, to the knowledge of such Purchasers, threatened, that would affect in any material respect such Purchasers' ability to perform such Purchasers' obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.1.7    Pursuant to the Sales Procedures Order, (a) neither the Purchasers nor any Person acting on behalf of the Purchasers have engaged in any collusion with respect to the submission of any bid or bidding or the Auction and (b) this Agreement is a good faith bona fide offer that Purchasers intend to consummate.

6.1.8    Neither the Purchasers nor any Person acting on behalf of the Purchasers has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which any Seller is or will become liable.

6.1.9    Notwithstanding anything contained in this Agreement to the contrary, the Purchaser acknowledge and agree that Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in Article 7 (subject to the disclosures set

forth on the Schedules), and the Purchasers acknowledge and agree that, except for the representations and warranties contained in Article 7, the Sale Assets are being transferred on a "where is" and, as to condition, "as is" basis pursuant to the Sale Procedures attached to the Sales Procedures Order. The Purchasers acknowledge that they have conducted to the Purchasers' satisfaction Purchasers' own independent investigation of Sellers' businesses and, in making the determination to proceed with the transactions contemplated by this Agreement, the Purchasers have relied on the representations and warranties expressly given by Sellers in Article 7 and the results of such Purchasers' own independent investigation. The Purchasers have received or may receive from Sellers certain projections, forward-looking statements and other forecasts and certain business plan information. The Purchasers acknowledge that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchasers are familiar with such uncertainties, that the Purchasers are taking full responsibility for making the Purchasers' own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to the Purchasers (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that the Purchasers shall have no claim against anyone with respect thereto. Accordingly, Purchasers acknowledge that Sellers make no representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

**6.1.10** Except for the representations and warranties contained in this Article 6, neither the Purchasers nor any other Person make any other express or implied representation or warranty with respect to the Purchasers or the transactions contemplated by this Agreement, and the Purchasers disclaims any other representations or warranties, whether made by the Purchasers, any affiliate of Purchasers, or any of Purchasers' or their affiliates' respective representatives. Except for the representations and warranties contained in this Article 6, the Purchasers disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the Sellers or Representatives. The representations and warranties of the Purchasers will expire upon the earlier of the Closing Date or the termination of this Agreement.

## 7   ARTICLE 7.

**7.1 Representations And Warranties Of Sellers.**  Sellers hereby represent and warrant to Purchasers that the statements contained in this Article are correct and complete as of the date hereof and as of the Closing Date:

**7.1.1** Each Seller is an entity duly organized, validly existing and in good standing under the Laws of Virginia. Subject to the limitations imposed on such Sellers as a result of the Bankruptcy Cases, each Seller has the

11

requisite corporate or similar power and authority to own or lease and to operate and use its properties and to carry on its business as presently conducted.

7.1.2    Each Seller has, subject to entry of the Approval Order, the requisite corporate power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller is a party and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by each Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing.  Subject to entry of the Sale Approval Order, as applicable, this Agreement and, when executed, the other Transaction Documents will, constitute the legal, valid and binding obligations of each Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

7.1.3    Except for (i) the entry of the Sale Approval Order and (ii) notices, filings and consents required in connection with the Bankruptcy Cases and the Sale Procedures Order, neither of the Sellers is  required to give any notice to, make any filing with or obtain any consent from any Governmental Authority in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby.

7.1.4    Immediately prior to Closing, Sellers will have authority to fulfill their obligations under this Agreement and, upon delivery to Purchasers on the Closing Date of the instruments of transfer contemplated by Section 5.1, and subject to the terms of the Sale Approval Order, Sellers will thereby transfer to Purchasers, marketable title to, or a valid contractual interest in, all of Sellers' assets, free and clear of all Liens. To the knowledge of Sellers, the Sale Assets are, in all material respects, in good operating condition and repair (ordinary wear and tear excepted) and are fit for use in the ordinary course of the Business.

7.1.5    Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Purchasers are or will become liable.

7.1.6    Except as set forth on Schedule 7.1.6, Sellers' inventory (i) consists solely of materials and goods useable or saleable in the ordinary course of the Business (taking into account the quantity and quality of the inventory), (ii) is not materially defective, slow moving, obsolete or damaged, and (iii) is fit and merchantable for their particular use in all material respects.

12

Except as set forth on <u>Schedule 7.1.6</u>, none of the inventory is subject to any consignment, bailment, warehousing or similar agreement.

**7.1.7** With respect to the real property and facilities acquired hereunder,  except as set forth on <u>Schedule 7.1.7</u>: (a) to the knowledge of Sellers, the applicable Seller is, and has for the three-year period prior to the Closing Date, been in compliance with all environmental laws applicable to such real property and facilities, which compliance has included obtaining and complying with all permits required pursuant to environmental laws; (b) no Seller nor any predecessor or affiliate thereof has received any notice, report or other information regarding any actual or alleged violation of, or any liabilities (including any investigatory, remedial or corrective obligation) under, environmental laws for the three-year period prior to the Closing Date, or that remain outstanding, unresolved or unsatisfied; (c) there is no pending claim asserting liability against any Seller or any predecessor or affiliate thereof alleging that the foregoing Persons have, and, to the knowledge of each of the Sellers, no Seller nor any predecessor or affiliate thereof has, treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, released, or exposed any person to, any substance, including any hazardous materials; and (d) to the knowledge of Sellers, no Seller nor any predecessor or affiliate thereof has manufactured, produced, sold, marketed, installed or distributed products or items containing asbestos or other hazardous materials such as would give rise to liability under environmental laws, and none of the foregoing persons have any liability with respect to the presence or alleged presence of asbestos or other hazardous materials in any product or item or at or upon such real property and facilities. Each of the Sellers have provided or made available to Purchasers true and correct copies of all environmental audits, reports and other documents materially bearing on environmental, health and safety matters relating to the real property and facilities.

**7.1.8** Except as set forth on <u>Schedule 7.1.8</u>, each Seller, and to the knowledge of such Seller each of its current and former officers, directors, partners, agents and employees, has, in all material respects, complied with and are in material compliance with, and are not in default in any respect with, all applicable laws and orders of any governmental authority relating to the operation of the Business and the ownership and use of the Sale Assets , and no written notices have been received by, and no claims filed against, any Seller alleging a material violation of any such laws or orders.

**7.1.9** Except as set forth on <u>Schedule 7.1.9</u>, there are no actions or other proceedings or governmental investigations pending or, to the knowledge of Sellers, threatened by or against Sellers or that otherwise relates to or may affect the Business or any of the Sale Assets. Except as set forth on <u>Schedule 7.1.9</u>, (i) there are no actions or other proceedings or governmental investigations pending or, to the knowledge of Sellers, threatened involving any products manufactured, produced, distributed or

13

sold by or on behalf of Sellers in connection with or related to the Sale Assets (including any parts or components) (collectively, "Products") or class of claims or lawsuits involving the same Product, which is pending or, to the knowledge of Sellers, threatened, resulting from an alleged defect in design, manufacture, materials or workmanship of any Product, or any alleged failure to warn, or from any breach of express or implied warranties or representations (collectively, "Product Liability Claims"); (ii) to the knowledge of Sellers, there has not been any Occurrence (as hereinafter defined); and (iii) there has not been, nor is there under consideration or investigation by Sellers, any recall or any Product rework or retrofit conducted by or on behalf of Sellers. For purposes of this Section 7.1.9, the term "Occurrence" shall mean any accident, happening or event which takes place at any time which is caused or allegedly caused by any alleged hazard or alleged defect in manufacture, design, materials or workmanship including any alleged failure to warn or any breach of express or implied warranties or representations with respect to, or any such accident, happening or event otherwise involving, any Product that is likely to result in a claim or loss.

7.1.10   Schedule 7.1.10 sets forth each Contract that is material to the Sale Assets, including without limitation the operations of the Business. Sellers have provided or made available to Purchasers true and correct copies of all such Contracts, in each case together with all amendments, waivers or other changes thereto.

7.1.11   Sellers have not sold, assigned, or otherwise transferred any assets into Cardinal Building Systems, LLC, a Virginia limited liability company ("CBS"). CBS owns no assets. Sellers shall use their best efforts to take action to change the name of CBS such that Purchasers shall be permitted to use the name of Cardinal Building Systems in the operation of the business going forward.

7.1.12   Each of the Sellers and their respective shareholders, directors, and officers have taken all actions that are required by their respective organizational documents, including without limitation, their articles of incorporation, bylaws, and resolutions, to obtain the requisite authority to enter into this Agreement and to fully perform its obligations under this Agreement, including without limitation, the sale of the Sale Assets to the Purchasers on the terms and conditions of this Agreement.

7.2   **No Other Representations or Warranties.**   Except as expressly set forth herein, Sellers make no representation or warranty, express or implied, at law or in equity, with respect to Sellers and the Sale Assets or any other information provided to Purchasers, their agents or representatives in connection with or in expectation of the transactions contemplated by this Agreement.   Sellers do not make any representations or warranties regarding information, documents, projections, forecasts or other material made available to Purchasers, their agents or representatives in connection with or in expectation of the transactions contemplated in this Agreement

14

except to the extent such information is expressly and specifically included in a representation or warranty contained in this Article 7.

# 8    ARTICLE 8.

## 8.1 Submission for Bankruptcy Court Approval.

8.1.1    The obligations of the Purchasers to purchase the Sale Assets and perform its other obligations under this Agreement shall be subject to and conditioned upon the entry by the Bankruptcy Court shall have entered (A) the Sale Procedures Order and (B) the Sale Approval Order and each of the Sale Procedures Order and the Sale Approval Order shall be in full force and effect, and shall not be stayed, modified, vacated or reversed.

The term "Sales Bid Procedures Order" shall be in form and substances satisfactory to Purchasers, approving certain bid protections and procedures for the sale the Sale Assets and/or the assumption by Purchasers of certain liabilities under the Assumption Agreement, including: (i) approval of payment to Purchasers in the event of termination of this Agreement for the reasons set forth in Section 11.1.8 a break-up fee in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) upon the approval of any successful competing bid (the "Breakup Amount"); (ii) a requirement that all competing bidders make a cash deposit of not less than ten percent (10%) of their purchase price, which deposit shall be non-refundable if the offer is accepted by Sellers and approved by the Bankruptcy Court; (iii) an initial overbid amount of not less than Three Hundred Twenty-Five Thousand Dollars ($325,000.00); and (iv) a deadline for the submission of competitive bids.

The term "Sale Approval Order" shall be in form and substance satisfactory to Purchasers, approving the consummation by Sellers of the transactions set forth herein, including the sale of the Sale Assets free and clear of all of the Liens, and the assumption of any liabilities effected by the Assumption Agreement, the execution and delivery of this Agreement and the Transaction Documents, and all other actions by Sellers that are reasonable or necessary to effectuate the transactions contemplated hereby.

8.1.2    If the Sale Approval Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Approval Order or other such order), subject to rights otherwise arising from this Agreement, Sellers and Purchasers shall use their commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

4840-9378-7821.v7

**8.2** __Transaction Expenses.__   Except as expressly provided for herein, each party shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the transactions contemplated hereby are consummated, except for the Purchasers' ability to seek a break-up fee under certain circumstances as provided in the Sale Procedures and in paragraph 8.1.1 of this Agreement. In the event that the Purchasers are not the successful bidder for the Sale Assets, and if Purchasers are not in breach of or default under this Agreement, Sellers shall pay the break-up fee to the Purchasers in immediately available funds upon Closing of the sale to another entity.

**8.3** __Further Assurances.__   Purchasers and Sellers shall, from time to time after the Closing, without further consideration, execute and deliver such instruments and take such further actions as may be reasonably necessary or desirable to carry out the provisions hereof and the transactions contemplated hereby.

**8.4** __Notifications.__   From the date of this Agreement until the earlier of the Closing or the termination of this Agreement pursuant to Article 11, Sellers shall give Purchasers prompt written notice of the occurrence of any of the following events:

**8.4.1**   Any loss, taking, condemnation, damage or destruction of or to any of the Sale Assets.

**8.4.2**   The commencement of any proceeding or litigation at law or in equity or any other commission, agency or administrative or regulatory body or authority against Sellers affecting the Sale Assets.

**8.4.3**   Any other materially adverse developments with respect to the Sale Assets.

**8.4.4**   Any event, occurrence or fact that causes any of the representations or warranties contained in Article 7 to be untrue at any time in any material respect; provided, that no disclosure by Sellers pursuant to this section shall be deemed to amend or supplement any provision of this Agreement or to prevent or cure any misrepresentation, breach of warranty or breach of covenant.

## 9   ARTICLE 9.

**9.1** __Conditions Precedent To The Obligations Of Purchasers.__   The obligation of Purchasers to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions (any of which conditions may, subject to Section 4.2, be waived by Purchasers in their sole discretion):

**9.1.1**   The representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on the Closing Date. Sellers shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Sellers on or prior to the Closing Date.  Excluding any objections to the entry of the Sale Approval Order, no action, proceeding or investigation (including, without limitation, actions, proceedings or investigations commenced or threatened by a governmental authority) has

been commenced or threatened to prevent, or seek damages as a result of, the execution and delivery of this Agreement or the consummation of any of the transactions contemplated herein (unless such action, proceeding or investigation has been dismissed or otherwise disposed of at least seven (7) days prior to the Closing Date).

9.1.2   The Bankruptcy Court shall have entered the Sale Approval Order in form reasonably satisfactory to Purchasers containing findings that (i) Each Purchaser is a "good faith Purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms'-length Purchasers; (ii) the Purchase Price is fair and reasonable; (iii) this Agreement was negotiated at arms' length; and (iv) the sale of the Sale Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, which Sale Approval Order, unless waived by the Purchasers, shall not be the subject of (a) a pending appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing, motion for new trial, or any other proceeding challenging the findings, conclusions or relief granted by the Bankruptcy Court, (b) a pending motion for stay, or (c) a stay in effect.

9.1.3   Purchasers shall have received all documents and other items to be delivered by Sellers pursuant to Section 5.1.

9.1.4   No claim, suit, action or other proceeding shall be pending before or by any court, governmental agency, arbitrator or other entity against any of the parties to this Agreement with respect to the transactions contemplated by this Agreement, except for the proceedings conducted in the Bankruptcy Court related to and arising out of the Bankruptcy Cases.

9.1.5   **Preservation of Assets.** Except as otherwise may be ordered by the Bankruptcy Court, Sellers shall preserve the Sale Assets in the ordinary and usual course of business, consistent with prior practices.

9.1.6   **No Material Changes in Sale Assets.** Except as otherwise may be ordered by the Bankruptcy Court, no action shall be taken by Sellers that shall effect the Sale Assets in any material adverse respect, or Purchasers' use of operation of the Sale Assets after the Closing.

9.1.7   **Operating Losses.** Except as otherwise may be ordered by the Bankruptcy Court, Sellers shall fund the operating losses associated with the Sale Assets from the effective date of this Agreement to Closing.

9.1.8   **Business Operations.** Prior to the Closing Date, the Sellers shall maintain the level of business operations that is not less than the production shown on the Schedules and Exhibits prepared by Protiviti and previously used as Exhibits in this Bankruptcy Case.

**9.1.9   Employment Agreement.** Bret Anthony Beneche has entered into an Employment Agreement which includes a covenant not to compete under terms and conditions satisfactory to the Purchasers that would become effective upon the Closing.

# 10  ARTICLE 10.

**10.1   Conditions Precedent To The Obligations Of Sellers.**   The obligation of Sellers to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions (any of which conditions, subject to Section 4.2, may be waived by Sellers in their sole discretion):

**10.1.1** The representations and warranties of Purchasers contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on the Closing Date.  Purchasers shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Purchasers on or before the Closing Date.

**10.1.2** The Bankruptcy Court shall have entered the Sale Approval Order containing findings that (i) Each Purchasers is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms'-length Purchaser; (ii) the Purchase Price is fair and reasonable; (iii) this Agreement was negotiated at arms' length; and (iv) the sale of the Sale Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code.

**10.1.3** Sellers shall have received the Purchase Price and other items to be delivered by Purchasers pursuant to Section 5.2.

# 11  ARTICLE 11.

**11.1   Termination of Agreement.**   This Agreement may be terminated only as follows:

**11.1.1**  By written agreement of Sellers and Purchasers at any time.

**11.1.2**  By Sellers, if subsequent events demonstrate that the proposed sale is not in the best interest of the Sellers' bankruptcy estate, as determined by the Sellers in their reasonable business judgment, which shall be exercised in good faith.

**11.1.3** By Sellers or Purchasers, if the Closing shall not have occurred on or before February 19, 2020, for any reason other than such party's breach of this Agreement.

**11.1.4**  By the Sellers, if Purchasers shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 10.1, and (ii) cannot be or has not been cured prior to the date that is five (5) days from the date that Purchasers are notified by

18

the Sellers of such breach or failure to perform; provided, however, that the Sellers shall not have a right to terminate this Agreement under this Section 11.1.4 if the Sellers are then in material breach of this Agreement.

**11.1.5** By Purchasers, if the Sellers shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 9.1, and (ii) cannot be or has not been cured prior to the date that is five (5) days from the date that the Sellers are notified by Purchasers of such breach or failure to perform; provided, however, that Purchasers shall not have a right to terminate this Agreement under this Section 11.1.5 if Purchasers are then in material breach of this Agreement;

**11.1.6** If the transactions contemplated by this Agreement are enjoined, restrained, or prohibited by a court or governmental agency;

**11.1.7** By Purchasers if Sellers breach their representations or warranties or fail to perform their covenants or agreements set forth in this Agreement, subject to prior notice and a fifteen (15) calendar day cure period.

**11.1.8** Automatically and without any action by either Purchasers or Sellers if the Bankruptcy Court approves an offer to sell the Sale Assets to a third party other than Purchasers.

**11.1.9** By Purchasers or Sellers if the Bankruptcy Court does not enter the Bid Procedures Order by 12:00 midnight on January 15, 2020.

## 12  ARTICLE 12.

**12.1** __Survival.__  The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and neither of the parties nor any of its respective officers, directors, representatives, employees, advisors or agents shall have any liability to the other after the Closing for any breach thereof.  The parties hereto agree that only the covenants contained in this Agreement that are expressly required to be performed at or after the Closing Date shall survive the Closing hereunder, and each of the parties hereto shall be liable to the other after the Closing Date for any breach thereof.

**12.2** __Jurisdiction.__  The parties agree that the Bankruptcy Court shall retain the exclusive and sole jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or the breach hereof.  Sellers and Purchasers hereby irrevocably submit and consent to the jurisdiction of the Bankruptcy Court, and Purchasers waive sovereign immunity in the Bankruptcy Court, for all matters relating to this Asset Purchase Agreement, including the enforcement of any terms, conditions, rights or remedies hereunder. Except as expressly consented to herein, nothing contained in the Asset Purchase Agreement shall be construed as a waiver of any of the Eastern Band of Cherokee Indians' sovereign rights nor sovereign immunity or Kituwah as its wholly owned subsidiary or its affiliates.

19

**12.3**    **Notices.**  All notices, consents or other communications required or permitted hereunder shall be given in writing and hand delivered or addressed and sent by Federal Express or other recognized overnight courier, or by certified or registered mail, postage prepaid, and return receipt requested, as follows or to such other address as may hereafter be designated by any party by the giving of notices in accordance with this Section 12.3:

|  |  |  |  |
|---|---|---|---|
| Sellers: | Bret Berneche | cc: | Michael Hastings |
|  | [_____] |  | [_____] |

| | | | |
|---|---|---|---|
| 12.3.1 Purchasers: | Mark Hubble | cc: | John H. Small |
|  | [_____] |  | [_____] |

12.3.2  All notices, consents or other communications shall be deemed given when actually delivered (in the case of hand delivery by Federal Express or other recognized overnight courier) or five days after mailing in accordance with this Section 12.3.

**12.4**    **Governing Law.**  To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without giving effect to rules governing the conflict of laws.

**12.5**    **Waiver.**  The waiver by a party of a breach of any covenant, agreement or undertaking contained herein shall be made only by a written waiver in each case.  No waiver of any breach of any covenant, agreement or undertaking contained herein shall operate as a waiver of any prior or subsequent breach of the same covenant, agreement or undertaking or as a waiver of any breach of any other covenant, agreement or undertaking.

**12.6**    **Severability.**  If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

**12.7**    **Counterparts.**  This Agreement may be executed in one or more counterparts (whether manually signed or by facsimile or other electronic means), each such counterpart shall be deemed an original, and all such counterparts shall constitute one and the same agreement.

**12.8**    **Captions; References.**  The headings, titles or captions of the Articles and Sections of this Agreement are inserted only to facilitate reference, and they shall not define, limit, extend or describe the scope or intent of this Agreement or any provision hereof, and they shall not constitute a part hereof or affect the meaning or interpretation of this Agreement or any part hereof.

**12.9**    **Amendments.**  This Agreement may not be amended, changed, modified, altered or terminated unless the parties hereto agree in writing to such amendment, change, modification, alteration or termination.

20

**12.10**  **Remedies Cumulative; Specific Performance.**  Except as otherwise expressly provided in this Agreement, no remedy herein conferred is exclusive of any other available remedy but each and every such remedy shall be cumulative and shall be in addition to every other remedy given by agreement or now or hereafter existing at law or in equity or by statute.  Except as otherwise expressly provided in this Agreement, in addition to any and all other remedies that may be available at law, in the event of any breach of this Agreement each party shall be entitled to seek specific performance of the agreements and obligations hereunder and to such other injunctive or equitable relief as may be granted by a court of competent jurisdiction.

**12.11**  **Binding Nature; Assignment.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Agreement and any of the rights, interest or obligations hereunder may be assigned by Purchasers hereto without prior written consent of the other party; any such assignment does not relieve any Purchaser from its obligations hereunder. Nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

**12.12**  **No Third-Party Beneficiaries.**  This Agreement is a contract solely between Purchasers and Sellers.  No third-party beneficiaries are intended hereunder and none shall be inferred herein; and no party other than Purchasers or Sellers may assert any right, make any claim or otherwise attempt to enforce any provision of or under this Agreement.

**12.13**  **Bankruptcy Court Approval.**  This Agreement is subject to approval by the Bankruptcy Court.

**12.14**  **Time of Performance.**  Time is of the essence for the performance of their respective obligations under this Agreement by each party hereto.

**[signatures on following page]**

4840-9378-7821.v7

**IN WITNESS WHEREOF**, the parties have caused their duly authorized officers to execute this Agreement as of the day and year first above written.

<u>**PURCHASERS:**</u>

**KITUWAH, LLC**

Name:  Mark A. Hubble
Title:  CEO

<u>**SELLERS:**</u>

**ALOUETTE HOLDINGS, INC.**

Name:
Title:

**CARDINAL HOMES, INC.**

Name:
Title:

22

# Exhibit 2

**ASSUMED CONTRACTS**

| Counterparty | Executory Contract/Unexpired Lease | Cure Amount |
|---|---|---|
| CSF Group<br>P.O. Box 58023<br>Charlotte, NC 28258<br><br>CSF Group<br>333 Industrial Dr., Suite B<br>Petersburg, VA 23803 | Trash Removal | $0.00 |
| Haleco<br>840 Memorial Drive<br>Danville, VA 24541 | Lease of Copier | $277.00 |
| TI RADCO, LLP<br>P.O. Box 47<br>Long Beach, CA 90805 | Third Party Inspections | $8,477.00 |
| OvrDlvr, LLC<br>235 Hill Prince Road<br>Virginia Beach, VA 23462 | QuoteSys Software Licensing | $800.00 |
| Kinex Networking Solutions Inc.<br>P.O. Box 562<br>Farmville, VA 23901<br><br>Kinex Networking Solutions Inc.<br>717 E Third Street<br>Farmville, VA 23901 | Internet/Phone Service; Tower on-site | $2,128.00 |
| Pennsylvania Lumbermens Mutual<br>   Insurance Co.<br>c/o Registered Agent Solutions, Inc.<br>7228 Hanover Green Dr.<br>Mechanicsville, VA 23111<br><br>Pennsylvania Lumbermens Mutual<br>   Insurance Co.<br>P.O. Box 826558<br>Philadelphia, PA 19182 | Insurance – Property and In-Transit | $0.00 |

| Counterparty | Executory Contract/Unexpired Lease | Cure Amount |
|---|---|---|
| The Cincinnati Insurance Companies<br>c/o Calvin W. "Woody" Fowler, Jr.<br>Williams Mullen<br>200 South 10th Street, Suite 1600<br>Richmond, VA 23219<br><br>The Cincinnati Insurance Companies<br>P.O. Box 145620<br>Cincinnati, OH 45250 | Insurance – General Liability | $0.00 |
| Berkshire Hathaway Homestate<br>Companies<br>c/o Corporation Service Company<br>100 Shockoe Slip Fl 2<br>Richmond, VA 23219<br><br>Berkshire Hathaway Homestate<br>Companies<br>P.O. Box 77029<br>Minneapolis, MN 55480 | Insurance – Auto-Fleet | $0.00 |
| Wood Products of Virginia Group<br>Self Insurance Association<br>8001 Franklin Farms Dr., Suite 217<br>Richmond, VA 23229 | Insurance – Workers' Compensation | $0.00 |
| Residential Warranty Company, LLC<br>5300 Derry Street<br>Harrisburg, PA 17111 | Customer Extended Warranties | $0.00 |